of America, et al., Andrew Pudimont, et al., Appellants. Mr. Nebaker for the Appellants. Mr. Schwartz for the Appellee Fenwick. Mr. Nebaker, good morning. Please, the Court. I would like to reserve three minutes for rebuttal, if I may. The qualified immunity issue in this case should have been resolved in favor of Appellants, the Deputy U.S. Marshals involved in the incident. When the District Court made the following observation, I think the last page of the decision in its published form, the Court said, some courts confronting factual scenarios similar to the one presented here have reached different outcomes, both as to the existence of a constitutional violation and whether any right violated was clearly established. That in and of itself tells us that it was not clearly established that what these Marshals did was unreasonable under the circumstances. This case, like Scott v. Harris in the Supreme Court, we have video footage. And the video footage tells the story sufficiently such that any reasonable law enforcement officer could believe that firing into this automobile that had been used as a weapon against Marshal Pudimont was reasonable. Again, that ends it. Who was being protected by the firing? Well, the District Court thought only Mr. Pudimont had been in any danger, and we think that's clearly wrong. But wait, before you go any further, in your brief, you say that the shots were fired after the car passed Pudimont and he was out of danger. You say that in your brief. Pudimont had been struck by the car already and had been pushed back, and then the firing started. And your brief says that the firing started after he, true, he had been hit by the mirror, but he was no longer in danger from the car. Well, keep in mind that we've cited authorities, including the Johnson v. Nias case, where the court said, you know, there's enough of a concern that the person could put the car in reverse and back over something. OK, but do we at least agree? Let's start with what you say in your brief, which is you agree that the, based on what you said, that the car was no longer a danger to Pudimont. Now, you're right, he might have been, it might have been, you know, a second later, and he might have been reacting, the police might have been reacting to it, but he was no longer in danger, right? I thought in my brief I said that if you assume, even if you assume that, you have to recognize that the general public was still in danger and Mr. Fisher was still in danger. But the district court said, with respect to Fisher, that, you know, you've got a collateral estoppel problem there, because the Superior Court judge refused to include an assault claim with respect to Fisher. Oh, actually, it wasn't Fisher that the Superior Court judge dealt with. And, of course, the... It wasn't Fisher? No, it was Mikkel, the one behind the vehicle. When Mr. Fenwick first backed up, he backed up as the officers were approaching him, and the car actually... So, is this quote not accurate? As Fenwick drove off, I don't see that he in any way towards Fisher. Do I have my notes wrong? I don't see that he is in any way a danger to Fisher. I thought that the other officer that was charged, whose assault had been charged, was Mikkel when the car backed up to him. And I think it may be the district judge that said he didn't see an assault on Fisher, not the Superior Court judge. I'm quoting from my... All I have here are my notes, which sometimes I concede are wrong. But it does say, as Fenwick drove off, I don't see that he in any way aimed towards or did anything towards Fisher. I think that's the judge... You think that's wrong? I think that's the district judge. I think he said that. I think it's wrong. But more importantly, it doesn't matter if Mr. Fenwick intended or didn't intend to go after Fisher. What the officers had to deal with in three seconds, three to five seconds, I think less than five, what he had to deal with was whether or not... There was reason to believe that Mr. Fenwick, having struck one officer, would pose or could pose a reasonable likelihood of serious injury to the general public or another officer. And the other officer would include Fisher. Let me go back. The quote I have here is... You're right. It's the district court. But he's quoting the Superior Court, and it is Fisher. I thought he... I thought... If so, I think he misquoted... Why don't you pull it up and take a look at it right now? Well... You got it? Let's just resolve this, because if you're right, we can go on to other things. I mean, it does... It's a pretty... If you're right, then, you know, then the case suddenly becomes quite easy. Well, the other thing you have to keep in mind is you can't use collateral estoppel against the officers, because they weren't parties to the underlying litigation. And it was never argued below by the other side. Let's resolve this question first. I... Here, let me see if I can find a page for you. On page 145... Because if you're right, that makes this a lot easier. Of the joint appendix, we have the charging documents from the Superior Court... We're looking for the quote from the Superior Court. Beth, do you have a page? Uh-huh. Yeah. Page... Joint appendix 146. It shows you that the Superior Court was charged with deciding whether or not Mr. Fenwick, on or about January 3, 2007, in the District of Columbia, while armed with a dangerous weapon, that is a motor vehicle... Yeah. ...without justifiable excuse, cause, that assault, resist, oppose, impede, intimidate, or interfere with Deputy U.S. Marshal John Mickle. So Mickle was the one that was behind the car. And that's where the Superior Court judge initially said, I found probable cause that he had assaulted Mickle. But afterwards, at the conclusion of all the evidence, concluded that it was possible enough that Mickle had ducked in the way after Mr. Fenwick started moving the car in that direction. And so the judge didn't think it was proper to say that he intended to run into Mickle. Now, the judge did, of course, find that he certainly intended to. Can you find in the Joint Appendix what the Superior Court judge actually said? I'm sorry, I just don't have the Joint Appendix site. I assumed you would. All right. I think this is Joint Appendix 571, referring to Poudamont. The other officer testified that he was toward the front of the car. He first banged on the side. Now, I'm looking for where the Superior Court says. Superior Court says he rejects an additional assault charge based on you say Mickle's, my notes say Fisher. As Fenwick drove off, right? Actually, you are correct. He does say, I don't see that he in any way aimed toward or resisted or did anything towards Officer Fisher. So I only find guilty of one count. I think the judge was confused because the charge of assault on a police officer was Mickle, who was the one that was behind the vehicle. But now keep in mind, what's going on here happens in three seconds. Poudamont has to try and figure out whether, having been struck by the vehicle, knowing that Mr. Fenwick is using this car as a dangerous weapon, and knowing that Fisher is over toward the other side and toward the front of the vehicle, whether or not he could pose a danger to Fisher, and whether Mr. Fenwick intended to negotiate between there's a red car parked on the left and he's got maybe a few inches between him and Officer Fisher. What you have to keep in mind, as the Supreme Court has said over and over again, is you have to, number one, look at it from the reasonable law enforcement officer's perspective, and you have to give them, you have to understand that they have to react in very short order, very little time. Can you still win if, let's try it this way. Suppose, for example, that what the Superior Court said there was accurate and that Fisher was not in danger. And suppose also that the car that Fenwick, that Poudamont hit by the mirror, was no longer in danger. Can you still prevail? They still could have used the amount of force that they did. Tell me why. Okay. In Brousseau and in Gardner, the courts… Well, Brousseau didn't address the Fourth Amendment issue. Well, at least address the qualified immunity issue. I'm asking about, okay, good point. And Gardner. Let's separate the two of them. I know your argument about clearly established, and that's your Brousseau argument, and you might be right about that. But on the Fourth Amendment question, whether there's a Fourth Amendment violation, if Poudamont was no longer in danger and if Fisher's out of the picture, is it still your position that there's no Fourth Amendment violation? That's correct. And tell me why. And that's because in Gardner, the court said that deadly force may be used to prevent a suspect's escape where he has threatened the officers with a weapon or where there is probable cause to believe he has committed a crime involving the infliction or threatened infliction of serious physical harm if, where feasible, some warning has been given. Now, here you had the concern about the general public. And in Scott v. Harris, the Supreme Court told us there doesn't have to be someone right in front of the car at the moment that we use deadly force against the person who's driving it in a dangerous way. So we already know that because of the findings by the Superior Court that Mr. Fisher has assaulted a police officer with a weapon. That is the vehicle. Can I argue he's a fleeing felon at that point? Exactly. All right. Go ahead. Exactly. And he would like you to believe that he was shot before that happened. Judge, the district judge got it correct insofar as the district judge said you are barred by heck and by collateral estoppel from arguing that he was the first, the officer was the first victim. So the government, your theory is that deadly force can be used to stop a fleeing felon, right? Well, yes. I will say that I don't have to bite off that bigger piece of the pie here when all I have to do is show that a reasonable law enforcement officer could believe so. And he's still entitled to qualified immunity. But, in fact, yes, I do believe it was lawful under Garner because Mr. Fenn was such a danger. We don't need to reach the constitutional issue, do we? We just need to reach qualified immunity. That's correct. But if we don't reach the constitutional issue, I think that's the line of the question. Garner. Sorry. And that's why we think it would have been acceptable. You may argue it's bad police work, but it is not in violation of the Fourth Amendment of the Constitution to believe that to protect the community, and it was a pretty busy street there at the end of that. Any fleeing felon? Well, I think you have to consider all the circumstances, but we certainly know that someone from Scott v. Harris, someone who's willing to use their car as a weapon, runs the risk that the officers will use deadly force to stop him. So if he had not struck Officer P. McCauley, then he hasn't used the car as a weapon, right? Well, unless you're going to consider that he may have. It was probable cause, even if not beyond a reasonable doubt, proof that he assaulted Mickle. Scott was one of these high-speed cases. It was a high-speed case. Not this case. Although I have to say that Rousseau makes it pretty clear that just because you're firing from behind doesn't mean it's wrong. Now we're back to clearly established. I'm asking you about the Fourth Amendment violation. I see your point about. I was asking. I just wanted to ask about whether there was a Fourth Amendment violation. We don't have to decide that. You do not have that. But that's what my questions are about. Certainly. And so, I mean, I get your point that the. Is it significant? It must be significant to your case, I take it, that the Superior Court found him guilty, correct? That's correct. Yeah. That precludes him from saying I was just sitting there idling when they shot. But, yeah. And that is clearly supported by the record. And Planoff hasn't argued any reason to reject the Heck argument. And his arguments were against the collateral estoppel that we did. See, Garner says. You quoted Garner. Garner, it also says. It says this right before the sentence you quoted. It says, where the suspect poses no immediate threat to the officer. And that's built into my question, right? Because the car went past Poudamire and Poudamont. I'm sorry. And Fisher was not there. Let's just assume that for a minute, okay? No risk to the officer. And no threat to others. The harm resulting from failure to apprehend does not justify using deadly force. That's Garner. I think the difficulty you run into is he is still, as the court said in Planoff, until you, if someone is using a vehicle as a weapon, the threat remains until he's removed from that vehicle, until that vehicle stops. So that gets back to my question. If he had not struck Officer Poudamont, then it's a different case? Well, again, I might very well be here arguing that he probably, they had probable cause to believe he struck Mikkel. The video may or may not support such a conclusion with respect to Fisher. But I'm giving you a hypothetical. He didn't strike anyone with the car. He just backed up and drove away. If he was driving away and they saw him driving down the sidewalk. They said, stop, stop, and he just drives away. And they're not standing in his path. That's right. Then I think what you learn from Garner is, and from Scott V. Harris as well, the reason the court was. . . True. Although, I have to say, Scott V. Harris, the high-speed portion of the case, tends to focus on whether or not this person is dangerous. And so, with your hypothetical where he hasn't struck an officer, it may be different. But I don't think you have to. . . He's a felon. He's a felon, and you could get it on the first prong of Garner, or you could do both. In my hypothetical, they have reason to believe that he has stolen a car. And he's going to get away. They tell him to stop, and he drives away. You think that allows them to shoot him? I think Garner would not allow that, unless there's some reason to believe he's using that vehicle as a weapon. I don't think you can presume. And your reason to believe is that he has struck the officer. Exactly. And although it may take 10 minutes in the high-speed chase if the person doesn't come near any other cars and is driving in the lane. . . Let me ask you, if you can crystallize, what was the district court's error on qualified immunity here? What was the mistake? There were two that I've been able to at least categorize. The first is that only Poudamont was in danger, and that ignored the fact that Fisher was also at least arguably in danger and that there was a need to protect the general public as well. This depends on your statement that the Superior Court made a mistake, right? Well. . . Right? It does. He still has to assess whether or not it was. . . No, he says the Superior Court says that he's not going to allow an assault charge based on Fisher's position because he didn't see any danger to him. Except if you look at the. . . You tell me that's wrong. If you consider the video footage, if he's close enough to Fisher to reasonably be believed to be a threat with his vehicle toward Fisher, then the officers would be authorized to fire to protect Fisher. So it doesn't have to be without a reasonable doubt in Verner. . . Finish your answer to Judge Griffith. You said there were two errors in the district court's decision. One was Fisher. What was the other one? Yeah. So he ignored the fact that Fisher and the general public. . . Is that two? Fisher and the general public? Or are they separated? I think I was going to add them together and say others beyond Poudamont. The other thing that the judge found or believed was that there were fact findings that had to take place to determine when the shots were fired, such as to be able to allow the court to assess whether or not qualified immunity would apply. And we know. . . And, of course, the district judge didn't have the benefit of Poudamont. . . Excuse me, of Plumhoff. But Plumhoff makes clear 15 shots in 10 seconds was not unconstitutional, that the threat still remained until, as the person was escaping, until the escape was stopped in the vehicle. So I think that the district judge was thinking, well, perhaps four shots was too many from Officer Fisher or three too many from Officer Poudamont. But, in fact, as the Supreme Court said in Plumhoff, 15 is not too many in the course of 10 seconds when the threat still remains. Let me ask you a question about the video. I know this is not disputed, but I've looked at that video over and over, and I don't see how they were identified as marshals. I didn't see the badge. I didn't see marshal on the back of the jacket. And I just. . . Is it a matter of record? It is. In fact, if you look at Mr. Fenwick's declaration that he provided, of course, it has to be rejected insofar as it says they shot me before I ran into them. His counsel argues that he recognized, that Fenwick recognized they were there to do an eviction, not to investigate a stolen car. I don't know how he recognized that. But anyway. . . They might not have been in their dress uniforms. But he says in Joint Appendix 96, and this is the plaintiff's declaration now, at the time some U.S. marshals were there and across the parking lot, and an eviction service company with their van was there, and some of the men were standing there by the van near my car. I figured an eviction was going on, but that had nothing to do with me. I didn't think much of it. Do we know how they were identified as U.S. marshals? I know that in the Superior Court transcript it's in there. I apologize. I don't have the sites at my fingertips. But there was testimony about that, and the Court would like. . . I'll try and find it. What I'm asking is, did they say, U.S. marshals, stop? I mean, because they say, hey, hey, and he says. . . Right. Well, I think they remembered it differently. Poudamont, they definitely, even I think the plaintiff admits that Poudamont struck the side window. As Fenwick is backing out, Officer Poudamont smacks the driver's side window. All right. And then he's yelling for him to stop. According to plaintiff's witness, Ms. Young, she could hear the officers from her vantage point, which was halfway up the sidewalk where the Y on the sidewalk takes place or the walkway takes place. She heard them say, get out of the M.F. car. Right. But do we know from the record that when they said, hey, hey, which is the only thing I've been able to find, and he says, who, me, that they said, hey, hey, U.S. marshals, or U.S. marshals, stop? I don't remember if the U.S. marshals was uttered in the transcript. I know that there was questioning about did you warn him. You can't ignore the fact that someone he admittedly knew was a U.S. marshal is leaning on his car pointing a gun. I'm not disputing that. And that's a pretty good warning right there that if you proceed, that you run the risk that you're going to. I'm not disputing that. I'm just trying to find out when they first said hey, hey to him, how he knew they were U.S. marshals. He says he knew. I'm just trying to find out how he knew that. I believe that the testimony at the Superior Court hearing, which is in the record, they asked, and I think they had U.S. marshals on shirts or on jackets, and I'm not sure if they had. I think there was testimony that there was a marshal's badge, but it was an embroidered badge on one of their jackets or on one of their shirts. They were all dressed identically in the tape. That's all you could see. So, all right. We'll give you a couple of minutes. We would ask that the Court examine the undisputed video evidence and come to the conclusion that these marshals at a minimum are entitled to qualify. All right. Thank you. Mr. Schertz. Thank you, Your Honor. And I'm grateful that you focused on the larger picture because sometimes when we get involved in legal nuance, we miss the larger picture. Michael Fenwick was driving into, admittedly, a bad section of town, but it was not his fault that his girlfriend happened to live in that complex. He was there to give her a birthday present. He knew she wasn't there, so he was just going to drop it off. He left the car running. He had one of these padlocks, so he left the car running. He has a big boom box in his car, and no one interrupts him, and he sashays over to the apartment complex. But I would like to now step back and focus on a little bit of what is reasonable, what is objectively reasonable. According to the marshal's supervisors, they said that they saw that Fenwick was speeding. Now, this is not a reason to use deadly force. Then they said that they thought, and I'm going to paraphrase a little bit. He struck an officer with his car, right? No, that is not true. He didn't strike his officer with a car. Who was he striking with? Well, I'm asking what this court is. Did he strike an officer with a car? No. And the reason that I say that is, now I realize the record might, the judge came to that conclusion. But the video indisputably shows the distance between Poudamont... Well, you mean the Superior Court judge? Is that the judge you're talking about? Yeah, the Superior Court came to the conclusion that there were... We can't go around that. That finding is binding here. You can't win your case by trying to convince us that what the Superior Court said happened didn't happen. That's what Heck v. Humphrey saw. But what Scott stands for is... No, no, no. Do you agree with that? I believe, I'm asking this court to appeal to the reality that we live in the 21st century and we have video. I would love to appeal to the reality of the situation we live in, but we're also bound by the Supreme Court's decisions, right? And Heck v. Humphrey says that you can't challenge that Superior Court finding. You can't win your case by... Do you disagree with that? Well, I do think that there is a law in the District of Columbia that says if a judge makes a decision with respect to the law or the facts, that the appellate court can come to their own conclusions. But the D.C. Court of Appeals affirmed him, didn't it? Yes. Yeah, okay, so I just... I mean, you can spend your time any way you want, but I don't think that's a productive line of argument. Given the constraints that this court operates under. That's my only point. Well, at least let me put this one in. In frame 317, it is clear that the person who was looking at the action because she was interested in what was happening to Fenwick started to flee the scene. This was before Poudamont ever got to the front of the car. And therefore, it is the conclusion of the video that the shot was fired before Poudamont ever got to the front of the car. The video also shows that Fisher was never in the zone where he could be hit. And furthermore, if an officer puts himself in a position where he causes the result that he has to use deadly force, that this kind of conduct is not objectively reasonable. So, my argument that the excuses that the marshals give, this is the marshal's statement, that they were afraid that he might interfere with the eviction. This is not grounds to use deadly force. There was no grounds to use deadly force. Poudamont did not start his running towards the car until after Fenwick backed up. And Fenwick was told at that time that they were just interested in talking to him, that he wasn't under arrest. And so, here he is backing up, and the boom box is blaring, he's got tinted windows, and he's driving. And he doesn't even know who shot him, according to Fenwick. And he found out at the hospital. This is not the kind of a case where somebody is, there's an all-points bulletin out there, and they've been chasing him for a while. This is a case of somebody who's just dropped off a present who says, who me? So, even if you're able to show a constitutional violation, you have to show that the violation violated clearly established law, right? There's two parts here. Yes. So, what do you do about, the government cites Brasso versus Hogan. How do you distinguish that? How is that case any different from this one? Because what preceded Brasso was serious conflict. They didn't say, well, you're not under arrest, and we just want to talk to you. Fenwick just got in the car. And it wasn't until after he got in the car that the officers actually rushed the vehicle. There was no notice to Fenwick. In Hogan, in Brasso, the officer, Hogan was in his car. He was shot in the back by the officer. And the officer later explains that she was fearful for the other officers on foot, who she believed were in the immediate area, and for occupied vehicles in the area, and for any other citizens. And the Supreme Court found that that was sufficient to deny, to grant qualified immunity. I just don't see how you distinguish that case from this case. Well, my understanding in Brasso, there was a fight going on before. The police come up on the scene. And mind you, they're police officers, not marshals. We don't see the marshals standing in the back of this room going out and writing tickets for speeding. We don't expect that. Out of the blue, here is Fenwick coming into this area. So in Hogan, you've got a fight. Yeah, you've got a fight. And here you have Fenwick having been convicted under D.C. law for assault on a police officer, a crime that's defined as creating a grave risk of causing significant bodily injury to an officer. He had no intent to do that. Wait. He was just driving his vehicle towards the only place. You're only resisting, heck, just suppose you're wrong about that. Suppose you're bound, suppose we're bound to accept the facts of a Superior Court conviction, that he was convicted of assault with an assault on a police officer. That's what he was convicted of. Just assume for purposes of argument, I gather you don't agree. But doesn't that make this case just like, in fact, even worse than? No, no, no, because the district court judge made distinctions, and he said, okay, for purposes of heck, you can't use the heck argument during that period of time where he's being hit. But if he got to a position of safety, then you may proceed with your argument. And furthermore, we can proceed with our arguments if, given the totality of the circumstances, that using deadly force was excessive under the context. And so, yes, we can still go forward with this case according to the district judge, which, of course, we'd agree with. Thank you. What I'm really troubled by is here is a 16-year-old boy where they, according to them, he looked too young to drive. And therefore, they conclude he's, therefore, old enough to shoot. I mean, they're coming into a section of town where they don't want to be causing these kinds of disturbances. And yet, they're singling out this gentleman before he's under arrest, before they have any evidence that he's committed any crime at all. They actually create the crime of which he is charged. And he had no intent to run over the officer. He just had an intent to get out of the way of somebody who was shooting him. And I would say my last moment is to argue that under Scott v. Harreth, this court, if it chooses to do so, can look at the video and say the video that is, everyone agrees, is an unaltered video, says certain things that the history of the case does not and that you can trump it. And there's every reason to do so in a case where this is just a 16-year-old boy dropping off a present to his girlfriend. All right. Thank you. Does Mr. Debecker have any time left? All right. Why don't you take a minute? Your Honor, I did find in the record where the description of what the marshals were wearing can be found in appendix 240. And on that page, Mr. Fisher testifies that I had on a pair of khaki. All three of us had khaki pants on. I had a blue sweatshirt on with my badge hanging around my neck displayed. Deputy Poudelant had on a marshals-issued black jacket with a lapel badge that's exhibited.  And Deputy Mikkel had on a marshals-service sweatshirt that had a badge on it. Okay. Great. And where is that again? That is joint appendix page 240. Okay. Thank you. I would just like to point out that we have not heard Mr. Fenwick's counsel identify any clearly established law that was violated on the undisputed facts in this case. He asked us to examine the video, and I think that's appropriate. But keep in mind that the D.C. Court of Appeals has done so, and if you're asking officers to conclude that it's not reasonable, the D.C. Court of Appeals said that it was not at all unreasonable for the judge to find that Fenwick's conduct in continuing to drive when the marshals were in the immediate vicinity of the car and when one of them had leaned onto it, created the requisite risk of significant bodily injury. It is difficult to discern how the events on the videotape could reasonably be considered as not being fraught with serious danger. In light of that fact and the reasonableness of that reading of the video footage, we believe that the officers should have been granted qualified immunity at a minimum in this case. All right. Thank you.
judges: Henderson, Tatel, Griffith